**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Thomas WESSON, Lisa Harris, and Gloria Steele, Defendants– Appellants.**

Nos. 92–2938, 92–3005, 92– 3006 and 94–2627.

United States Court of Appeals, Seventh Circuit.

Argued* April 6, 1994.

Decided Aug. 25, 1994.

---

* Nos. 92–2938, 92–3005 and 92–3006 were argued jointly. After oral argument, No. 94–2627 was submitted as a subsequent appeal.

Barry R. Elden, Asst. U.S. Atty., R. Christopher Cook (argued), Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for U.S. in Nos. 94–2938, 94–3005 and 94–3006.

Eugene Steingold (argued), Chicago, IL, for Thomas Wesson.

William J. Stevens (argued), Chicago, IL, for Lisa Harris.

Scott J. Szala, Winston & Strawn, Patrick C. Hess (argued), Stein, Ray & Conway, Chicago, IL, for Gloria Steele.

Ronald S. Safer (submitted), Office of the U.S. Atty., Criminal Div., Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for U.S. in No. 94-2627.

Thomas Wesson, pro se.

Before COFFEY, EASTERBROOK, and MANION, Circuit Judges.

MANION, Circuit Judge.

In February 1992, the government issued a twenty-seven-count indictment against twenty-two members of a large-scale heroin distribution ring. Three who went to trial were convicted and now appeal. Thomas Wesson was the ringleader; Gloria Steele was a Chicago police officer and Wesson's mother who laundered drug money for the ring and otherwise participated in its activities; and Lisa Harris was a lower-level operative who helped to process telephone calls. Wesson and Steele challenge their convictions; Steele and Harris challenge their sentences. We affirm the district court in all respects.

## I. Facts

In late 1987 or early 1988, Wesson took control of a heroin distribution organization from his relative, Leon Moore. Wesson proved to have an aptitude for business. He oversaw the sophisticated operation, which manufactured, packaged, marketed, sold and supplied large quantities of heroin for street-level dealers and users. The organization was known by its employees and customers as "The Cartel" or "The Family." At its height under Wesson's direction, the organization took in $50,000 in daily revenue.

"The Cartel" or "The Family" had the earmarks of a sophisticated, well-managed company. Wesson frequently purchased large quantities of raw heroin from various suppliers. He would give the raw heroin to employees known as "shake girls," who would dilute it by mixing it with other substances. They would then pack the finished product in one-eighth gram foil packets. To maximize efficiency and security, the mixing operations were conducted at night under the protection of gun-toting ring members.

Workers bundled the foil packets in thirty-package units for morning distribution to "street teams" and eventual sale to customers.

The street teams would fan out to pre-arranged locations in the area of distribution. Customers would call telephone operators employed by the ring. The operator would ask the caller "Where did you last shop?" meaning where did the caller last purchase heroin. If the caller identified a location where the street teams had previously worked, then the operator knew the caller was a legitimate customer. The operator would give the caller a location of one of that day's street teams, and a password to use to purchase the heroin. Lisa Harris was one of the telephone operators.

Security was a primary concern for the ring. Wesson authorized various measures to escape detection and capture by law enforcement officials. The organization moved its packaging and telephone operations frequently, and always maintained these separate operations at different locations. Sometimes street teams would change locations in the middle of the day, or shut down sales when too many customers were arriving. They would contact the telephone operators, including Lisa Harris, to notify them of these itinerary changes, so that arrangements could be made to shift the customer flow. Wesson also provided guns for the street teams to protect against robbery, and employed runners to replenish their heroin supplies and collect money.

Wesson had an invaluable resource to help in his efforts to avoid law enforcement: his mother, Gloria Steele, who was a Chicago police officer. Steele gave Wesson information on police patrols, and also taught him how to effectively operate police scanners, which he had purchased for the ring. She described for her son the way the Chicago police switched channels on the scanners depending on the circumstances. She also let the ring use the basement of her house for at least two months as a workshop for mixing and packaging the heroin. She was often present when heroin was being mixed, money was being counted, and telephones were being answered. At least once she was present

in her police uniform in her son's apartment when he purchased raw heroin. A post-arrest search of Steele's house uncovered several guns belonging to the ring.

Steele provided more than just support and counter-intelligence for her son's drug activities. Perhaps her most important role in the organization was money laundering. Much of the ring's money was spent paying employees and suppliers. Some was spent on jewelry, automobiles, and other consumer products. But a large part of the revenue was invested, in such diverse interests as a restaurant, a shoe store, rental property, a house, and a semi-professional football team. Steele, trading on her status as a police officer, helped make some of these investments. She was given tens of thousands of dollars in drug profits; the payments ranged from $1000 to $90,000. The payments were often made to Steele while drug operations were taking place in front of her. Steele used some of the money to purchase and maintain real estate. She also placed some of the money in bank accounts under other people's names.

After their arrest, Thomas Wesson, Gloria Steele, and Lisa Harris were tried together. The government pieced together the details of the drug ring with testimonial, documentary, and physical evidence. Only two pieces of evidence have been challenged on appeal. Wesson contests the introduction of any evidence gathered pursuant to his arrest; he says he was arrested illegally. Steele contests a part of the testimony of Jeffrey Smith, who had been a member of the ring. He related on direct examination that Wesson would tell him when to move the street teams because police were getting hot in their area. When the prosecutor asked, "Where did Thomas Wesson get this information?" Smith answered, "He said he got it from his mother." Steele contends that Smith's answer was impermissible hearsay.

The jury convicted Wesson of one count of conspiracy to possess and to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 and aiding and abetting that conspiracy in violation of 18 U.S.C. § 2 (count one); one count of engaging in a continuing criminal enterprise in

violation of 21 U.S.C. § 848 (count two); two counts of using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) (counts three and twelve); nine counts of distributing heroin in violation of 21 U.S.C. § 841(a)(1), and aiding and abetting that distribution in violation of 18 U.S.C. § 2 (counts four through eight, ten, eleven, fifteen, and seventeen); three counts of using a communications facility in committing and in causing and facilitating the commission of a federal drug crime in violation of 21 U.S.C. § 843(b) (counts nine, sixteen, and eighteen); and four counts of money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (2) (counts nineteen through twenty-two). The court sentenced Wesson to concurrent sentences of life imprisonment on counts one and two; 240 months imprisonment on each of counts four, five, six, seven, eight, ten, eleven, fifteen, and seventeen; 48 months imprisonment on each of counts nine, sixteen, and eighteen; and 60 months imprisonment on each of counts nineteen through twenty-two. The court also sentenced Wesson to 60 months imprisonment on each of counts three and twelve to run consecutive to each other and to all other counts. Finally the court sentenced Wesson to supervised release for life, in the unlikely event that he ever got out of prison.

The jury convicted Gloria Steele of one count of conspiracy to possess and to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 and aiding and abetting that conspiracy in violation of 18 U.S.C. § 2 (count one); and four counts of money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2 (counts nineteen through twenty-two). The court sentenced Steele to concurrent sentences of life imprisonment on count one and 60 months imprisonment on each of counts nineteen, twenty, twenty-one, and twenty-two, to be followed by five years supervised release.

The jury convicted Lisa Harris of one count of conspiracy to possess and to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 and aiding and abetting that conspiracy in violation of 18 U.S.C. § 2 (count one); and one count of heroin distribution in violation of 21

U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (count seventeen); and one count of use of a communications facility in committing and causing and facilitating the commission of a federal drug crime in violation of 21 U.S.C. § 843(b) (count eighteen). The court sentenced Lisa Harris to concurrent sentences of 10 years imprisonment on count one; 12 months imprisonment on count seventeen; and four years imprisonment on count eighteen; to be followed by five years supervised release.

Wesson filed a notice of appeal challenging his conviction; Steele filed a notice of appeal challenging her conviction and sentence; Harris filed a notice of appeal challenging only her sentence. We consolidated all of the appeals, and shall now address, in order, the issues which have been raised.

## II. Analysis

### A. Sufficiency of the Evidence

#### 1. Gloria Steele.

Gloria Steele contends that the evidence introduced at trial was insufficient to convict her of the conspiracy. Basically, she claims that the evidence established only that she was a naive mother, supportive of her son's business but ignorant of its criminal nature. She argues that there was no evidence that she intended to join the "heroin-distributing purpose of her son's conspiracy."

■ An appellant who seeks to overturn a criminal conviction based on the sufficiency of the trial evidence "faces a nearly insurmountable hurdle." *United States v. Teague,* 956 F.2d 1427, 1433 (7th Cir.1992). We review the evidence presented at trial in the light most favorable to the government, and will affirm if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Penson,* 896 F.2d 1087, 1093 (7th Cir.1990). We will not reweigh the evidence or make credibility determinations; as an appellate court viewing the trial record, we are incapable of assuming the role of the factfinder. *United States v. Marin,* 7 F.3d 679, 688 (7th Cir.1993).

■ Because Steele challenges her conspiracy conviction, we must determine whether the government presented sufficient evidence to prove the elements of conspiracy. A conspiracy is a "combination or confederation of two or more people formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Mayo,* 721 F.2d 1084, 1088 (7th Cir.1983). To prove conspiracy, the government must introduce evidence that the defendant knew of the conspiracy, and intended to join it. *United States v. Townsend,* 924 F.2d 1385, 1390 (7th Cir.1991).

■ At trial, Steele was shown to be thoroughly involved in her son's ring. The veneer of naive mother peeled away as a number of witnesses and other evidence portrayed Steele fully enmeshed in her son's criminal enterprise. Witnesses place Steele at the site of heroin production and distribution. The testimony also showed Steele, a Chicago police officer, providing the ring valuable information on police activity and procedures. Most importantly, testimony and other evidence had Steele receiving large amounts of money from the ring, and laundering it in apparently legitimate investments. We need not set forth every piece of evidence introduced against Steele, but an overview of the evidence portrays a person involved in several aspects of the operation.

The government's case was particularly strong because only three of the twenty-two ring members were on trial; most of the rest had pleaded guilty and testified against their former associates. Co-conspirators Jeffrey Smith, Veronica Jones, and Israel Olarenwaju, who had different roles in the conspiracy, testified that Steele had contacts with them when they conducted their drug operations. Apparently, Steele made the rounds with her son on occasion to observe different aspects of the diverse heroin operation. Workers Smith and Jones testified that Steele was sometimes present where telephones were being answered and drugs were being mixed. Olarenwaju testified that once when he sold Wesson a large amount of heroin, Steele was present in her police uniform.

Steele confirmed her knowledge of her son's business in several conversations which

the government secretly tape-recorded in the course of its investigation. In a conversation with Roderick Parker, Wesson's "First Assistant" (who unbeknownst to Steele was cooperating with the government at the time), Steele commented on the poor health of one of the ring's members. She said, "I'm tellin' ya you can only do this for a little while." At trial, Parker testified that he understood "doing this" to mean dealing drugs. Later in the conversation, Steele lamented about the pitfalls of dealing drugs:

> STEELE: ... And see before, it was easy, you know, it was easy, you didn't have a lot of cops and stuff they didn't bother you, you know, it was cool.
>
> PARKER: Um, hm.
>
> STEELE: ... But now everybody's all into this drugs is runnin. inaudible ... But you know something, I always took it like this: drugs really don't come lookin for the customer.
>
> PARKER: Right.
>
> STEELE: The customers come lookin for them.

Steele went on to tell Parker that "[p]eople have been doin' drugs since before Christ," citing such famous examples as "King Louie," "Queen Elizabeth," and "George Washington."

Steele and Parker had a series of conversations which the government taped. Steele freely discussed many aspects of the drug ring on those tapes. She criticized her son for not requiring ring members to take stricter precautions to maintain secrecy, summarizing her concerns as follows:

> They ah, they ah, they do a whole lot of things wrong so you know when you do it like that you gotta, you know, you gotta expect to have problems. You don't let nobody know what your business is, you know what you're doing. You just, you just keep it between you.

She later discussed the ring's falling drug profits, which she attributed to spending too much money on "flashy" consumer products, which she thought only served to attract unwanted attention:

> PARKER: It shouldn't be like this. We were making almost 50,000 dollars a day at one time. Where did all that (inaudible) to?
>
> STEELE: And then you know a lot of real estate capital, a lot of stuff to do you know, like I told Tommy he had no business buying all those damn cars and spending that kind of money on all those cars.
>
> PARKER: That was my fault too. That was my down fall too.
>
> STEELE: Ah um, everybody want to be flash and dash s--t all that s--t that don't do nothing but bring the heat on you. Don't bring nothing but problems on you....

Steele favored placing the drug money in sound investments. She took large portions of the ring's money—in payments ranging from $1,000 to $90,000—and made such investments. She often received these payments while drug operations were going on in her presence.

When the police finally uncovered the ring, they found several police scanners. They also recovered a list of police districts, the location of police stations, and the frequencies used with the scanners. At one site they found a note giving detailed instructions to operate the scanners: "If they switch to C wide, put on channel 10. Clear all beepers after callback to line controllers."

True, some of this evidence permits inferences not necessarily leading to the conclusion that Steele was a conspiracy member. For instance, many people—not all of them drug dealers—talk about possible drug use by historical figures. Many, too, lament that fancy clothes and cars can attract attention. And Gloria Steele did not necessarily provide the detailed information about how to use police scanners. But we have criticized viewing evidence in such a piecemeal fashion:

> [I]t is also imperative that we not rend the fabric of evidence and examine each shred in isolation; rather, the reviewing court "must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of [inaccurate] or ambiguous inference."

*United States v. Durrive*, 902 F.2d 1221, 1229 (7th Cir.1990) (quoting *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983)).

Considering the totality of the government's case—which we only briefly describe here—the evidence strongly supports the conclusion that Steele was a member of the drug conspiracy. Steele had her chance to cross examine and otherwise challenge the government's case with the objective of presenting herself as an innocent bystander. She failed to convince the jury that she was not involved. The jury viewed the evidence and concluded that Steele was a member of the drug conspiracy: that she knew of its existence and intended to join it. We conclude that the evidence was sufficient to support this conclusion.

### 2. Thomas Wesson.

■ Wesson challenges the sufficiency of the evidence compiled to convict him for aiding and abetting several of the crimes listed in the indictment. He claims that there was no evidence introduced at trial that he was anywhere in the vicinity of the crimes as they were committed, and therefore, that he could not have aided and abetted their commission.

We will affirm a conviction for aiding and abetting if substantial evidence shows that the appellant had "knowledge of the illegal activity that is being aided and abetted, a desire to help the activity succeed, and some act of helping." *United States v. Zafiro*, 945 F.2d 881, 887 (7th Cir.1991). *See also United States v. Allen*, 10 F.3d 405, 415 (7th Cir.1993). The evidence adduced at trial showed Wesson, as ringleader, integrally involved in all aspects of the drug operation. Wesson argues only that he did not personally commit the crimes which he was found to have aided and abetted. But the law does not limit this type of liability only to those who personally committed the crimes. The statute is clear that one may be accountable for aiding and abetting if the evidence shows that he aided, abetted, counseled, commanded, induced or procured the crime's commission. 18 U.S.C. § 2(a). And there is enough evidence that Wesson, as ringleader, knew the crimes were taking place, and used his

considerable organizational skills to facilitate their completion.

Nearly every witness the government called testified about Wesson's primacy in the drug ring. He organized the network through which the heroin flowed to the customers. He trained the telephone operators; he was everyone's boss and employer. Even the statements by Wesson's mother previously discussed show that she knew her son's place at the head of the organization. True, sometimes Wesson did not oversee every detail of the operation. Like any successful manager, he knew how to delegate authority. But he was no less responsible for aiding and abetting any particular drug deal just because he did not know its details. He knew about the broader picture: that drugs were being dealt. The ring used his leadership to further its ends. He trained and supervised his subordinates. This is the essence of aiding and abetting: knowledge of the illegal activity, a desire to help, and some act of helping. There was sufficient evidence that Wesson met all of these requirements.

### B. Evidentiary Challenges

Wesson and Steele challenge some of the evidence introduced at trial. Wesson claims that he was arrested illegally, and that the evidence seized incident to his arrest should have been suppressed. Steele claims that one of the government's witnesses, Jeffrey Smith, used impermissible hearsay to implicate her in telling the ring about police activity.

Wesson faces a preliminary hurdle in his evidentiary challenge. He disputes the district court's refusal to suppress evidence acquired pursuant to his arrest. But he never made a motion to suppress before trial, as is required under Rule 12(b)(3), Fed.R.Crim.P. In fact, his attorney only raised the issue at trial during a brief sidebar three days after the supposedly troublesome testimony. The attorney did not frame his challenge as a belated motion to suppress; therefore, the court never asked him to demonstrate "cause" for his untimeliness as would be required under Rule 12(f), Fed.R.Crim.P. The attorney simply made a general challenge to

the testimony. The court denied the challenge.

There are three suggested ways to view the district court's evidentiary ruling, with three different methods of review. First, if Wesson waived his evidentiary challenge by not making a timely objection, we would review the decision to admit the evidence for plain error—the government argued for this alternative. *See United States v. Fulford*, 980 F.2d 1110, 1115 (7th Cir.1992). Second, if the district court denied the objection because Wesson failed to show sufficient "cause" to compel the court to hold a belated hearing on the motion to suppress, then we would review the court's decision on the issue of "cause"—a member of this court suggested this possibility during oral argument. *See Davis v. United States*, 411 U.S. 233, 242, 93 S.Ct. 1577, 1582, 36 L.Ed.2d 216 (1973). Third, if the court simply made a decision on the objection as it pertained to contemporaneous testimony, we would review that decision for an abuse of discretion—Wesson appeared to argue for this alternative. *See Fulford*, 980 F.2d at 1114.

■ There is no need to engage in the tedium of trying to interpret the events at trial in order to decipher how the judge really disposed of this objection. Wesson loses under any standard of review. Police officers testified that they observed Wesson driving on the wrong side of the street, they stopped him, and they arrested him after he produced a revoked license. His effort to suppress the evidence is based on his belief that he was arrested illegally. But the trial court could have reasonably concluded that the officers had probable cause to arrest, and therefore that the arrest was not illegal. *United States v. Fiala*, 929 F.2d 285, 287 (7th Cir.1991). So the evidence at trial supporting the propriety of the arrest eliminates the possibility of plain error or an abuse of discretion. Indeed, the abuse of discretion standard requires that a court's decision be unreasonable or at least unwarranted, and the plain error standard requires an actual miscarriage of justice; neither was present here, because the police officers' testimony supported the legality of the arrest. *See Fulford*, 980 F.2d at 1114 and 1115.

■ Nor was there cause to hold a belated suppression hearing. Rule 12(b)(3) requires a defendant to file a motion to suppress before trial, and Rule 12(f) permits a court to hold a hearing on an untimely motion only if the defendant shows cause for his delay. Fed.R.Crim.P. *See Wainwright v. Sykes*, 433 U.S. 72, 84, 97 S.Ct. 2497, 2505, 53 L.Ed.2d 594 (1977) ("review of [a belated motion under Rule 12] should be barred on habeas, as on direct appeal, absent a showing of cause for the noncompliance and some showing of actual prejudice resulting from the alleged constitutional violation."). At trial, Wesson's attorney never even attempted to show cause for his delayed objection. On appeal, the best reason he can muster for his untimely objection is that the police officers' testimony about the arrest "was totally inconsistent." But we are unable to review the credibility of witnesses; from our vantage point as an appellate court, we can only defer to the trial judge's view of the facts. The trial judge obviously did not consider the police officers inherently incredible. The argument that an opposing witness was not believable is an especially bad reason to bypass the requirement of Rule 12(b)(3). There was no cause to hold a belated suppression hearing.

Steele's objection is more straightforward. She made a contemporaneous objection at trial to the testimony of Jeffrey Smith, who was one of her co-conspirators in the drug ring. Smith ran a street team, and told the prosecutor that Wesson dictated when to change locations because of increased police activity. When the prosecutor asked, "Where did Thomas Wesson get this information?" Smith answered "He said he got it from his mother." Steele objected to this testimony, contending that Smith's statement was impermissible hearsay.

■ Smith's testimony actually relates two statements: one by Steele, telling her son about police activity; and one by Wesson, conveying this statement to Smith. Both sides in this appeal describe Smith's testimony as double hearsay. We do not know the exact content of Steele's original statement. She probably told Wesson something like

"the police will be patrolling 74th Street this morning." The classic formulation of hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Rule 801(c), Fed.R.Evid. The prosecutors would have no reason to prove that the police were actually patrolling at a certain location on the morning in question, which is the matter asserted by the statement. Because the first statement was not offered to prove the truth of the matter asserted, it was not hearsay. *Cf. United States v. Ford,* 21 F.3d 759, 764 (7th Cir. 1994). The prosecutors, however, did want to prove that Steele was providing confidential police information to the drug ring. For that reason the second statement—where Wesson tells Smith that he got the information from his mother—would be hearsay. The matter asserted in this statement, essentially, is that Steele was providing confidential information about police patrols. Both sides, accordingly, were wrong in describing Smith's testimony as double hearsay. There is only one hearsay assertion we need concern ourselves with: Wesson's assertion that his mother told him about police patrols.

■ The district court allowed Smith's statement under the hearsay exception dealing with co-conspirator statements made in furtherance of the conspiracy. Rule 801(d)(2)(E), Fed.R.Evid. To apply that exception, a court must be convinced that "1) a conspiracy existed, 2) the defendant and the declarant were members thereof, and 3) the proffered statement(s) were made during the course of and in furtherance of the conspiracy." *United States v. Cox,* 923 F.2d 519, 526 (7th Cir.1991). Here, the government made a proffer at trial concerning Steele's and Smith's roles in the conspiracy, and the hearsay statement's purpose in furthering the conspiracy. Our decision in *United States v. Santiago,* 582 F.2d 1128 (7th Cir.1978), contemplated that the government make such a proffer when seeking to introduce a co-conspirator hearsay statement. Relying on that proffer, the district court determined that the statement fit the hearsay exception, and allowed it into evidence.

We review the district court's finding that Steele and Smith were members of the con-

spiracy and the statements were in furtherance of the conspiracy for clear error. *United States v. Rodriguez,* 975 F.2d 404, 411 (7th Cir.1992). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). There was no error here; all indications are that Smith and Steele were members of the conspiracy, and the statement was part of the flow of information which furthered the conspiracy. Therefore, the district court did not clearly err when allowing Smith's hearsay under the co-conspirator exception, Rule 801(d)(2)(E), Fed.R.Evid.

*C. Sentencing Issues*

Gloria Steele and Lisa Harris appeal their sentences. Steele, who was sentenced to life and then some, claims the court attributed too much heroin to her in calculating her offense level. She portrays herself as playing, if any, a minor role in her son's enterprise. She challenges the court's decision to hold her accountable for the bulk of the heroin that passed through the conspiracy during her four-year association. Harris also contends that the court overestimated the heroin attributable to her; the court determined that Harris was involved in the ring for at least eight weeks, and that she was responsible for at least three kilograms of heroin. Harris claims that, as a telephone operator, she had no connection with most of the heroin sold by the ring during those eight weeks.

"The amount of drugs involved in a conspiracy is a factual determination of the sentencing court which we review for clear error only." *United States v. Campbell,* 985 F.2d 341, 346 (7th Cir.1993). "Each conspirator is responsible for the amount of [drugs] he actually distributed and the amount involved in transactions reasonably foreseeable to him. The derivative nature of co-conspirator liability 'makes it imperative to determine the scope of the conspiratorial agreement each joined.'" *United States v. Goines,* 988 F.2d 750, 775 (7th Cir.1993) (quoting *United*

*States v. Thompson,* 944 F.2d 1331, 1344 (7th Cir.1991)). "The sentencing judge should state reasons why each individual defendant was aware or reasonably foresaw the particular amount of drugs for which he will be held accountable, with reference to supportive evidence." *Id.*

During the sentencing hearing, the government briefly summarized the evidence about Steele presented at trial, concluding that "[f]or at least four years she systematically and relentlessly participated in a huge heroin distribution organization that caused untold harm to the people of Chicago, the people she swore [as a police officer] to protect." The court, considering the trial testimony in the light most favorable to the government, found that Steele was well aware of the whole drug organization, was a willing participant in its activities, and therefore was "responsible for the entire amount of heroin distributed by the organization." The court added, "I think the government has been conservative in the method they have used to calculate the amount of heroin that this organization distributed, and I think the benefit of the doubt has been resolved in favor of the defendants as to the volume of heroin distributed by this very large and complex conspiracy." The court accepted the government's calculation, that 208 kilograms of heroin passed through the criminal organization during Steele's four-year involvement, and held her responsible for the entire amount.

As for Harris, her sentencing transcript reveals that there was evidence she was a telephone operator for the organization for more than two months. But the government decided to only hold her accountable for the heroin distributed by the organization over an eight-week period.[1] Harris argues that, as a lowly telephone operator, she was not aware of the entire amount of heroin passing through the organization over those eight weeks; nor could she have foreseen the en-

tire amount. The government responded to the same argument at the sentencing hearing, noting that in Harris' own post-arrest statement, she admitted to knowing the nature of the organization, and that she "received 40 calls per hour, and worked an 8 to 7–hour shift per day." After considering the evidence, the court accepted the government's calculation. The court determined that Harris could have foreseen at least three kilograms of heroin passing through the drug organization during her tenure.

The court thus found that Steele and Harris were responsible for the heroin that passed through the organization while they were affiliated with it. For Steele, who was affiliated with the organization for four years, this amounted to 208 kilograms. For Harris, who acted as a telephone operator for at least eight weeks, this amounted to three kilograms (based on the government's conservative estimate). We review these findings for clear error. *Campbell,* 985 F.2d at 346. Again, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511.

Steele and Harris make the argument that the evidence at trial showed them each to be involved in only a minor part of the conspiracy, and therefore, that they should not be on the line for the entire amount. They both argue that the law only allows them to be sentenced for the amount of heroin connected with their specific role in the conspiracy, as opposed to the amount of heroin generated by the entire conspiracy. But the law in this circuit does not make that distinction. As set forth in our previous cases on this matter, the crux of the sentencing court's inquiry is foreseeability. *See Goines,* 988 F.2d at 775.[2] If the criminal can

---

1. The government cut Harris a break by underestimating the amount of heroin which passed through the conspiracy over the eight-week period. Although there was evidence that at least three kilograms of heroin were being sold per week at this time, the government chose only to hold her accountable for three kilograms total, even though she was involved for at least eight weeks.

2. Steele and Harris argue that we should abandon this foreseeability standard in favor of one which narrows a conspirator's liability, measuring only the quantity of drugs which are connected to his particular role in the conspiracy. For example, Harris believes she should only be responsible for the amount of heroin ordered over her telephone. But we will not use this occasion

see no farther than his specific function, then he should only be sentenced for the amount of drugs connected to his role. But if a criminal foresees the broader network of production and distribution, then he can be sentenced for the amount of drugs attributable to the broader network. *See United States v. Morrison*, 946 F.2d 484, 501 (7th Cir.1991) ("[t]hose convicted of conspiring to violate the drug laws are criminally responsible for the total quantity of drugs in which the conspiracy they joined can reasonably be estimated to have dealt."). Under the Sentencing Guidelines, ignorance could be a benefit, but awareness carries a heavy price.

■■■ Here, the district court determined that Steele and Harris were aware of the broader network, and therefore foresaw the amount of heroin sold: Steele for four years, and Harris for eight weeks. In reviewing this finding we are not left with a definite and firm conviction that a mistake has been committed. Although Steele would have us believe she performed a motherly role blind to her son's far-flung criminal activities, and Harris presents herself as an isolated operator unaware of the breadth of heroin distribution, the district court did not clearly err in finding otherwise.

Finally, it should be noted that Steele faced a nearly impossible task to get her sentence reduced because of the district court's finding on the quantity of heroin. She was sentenced based on the finding that she was liable for 208 kilograms. Her base offense level for the quantity of heroin, therefore, was 40. U.S.S.G. § 2D1.1. In order to reduce this base offense level to 38, Steele would have had to knock off at least 108 kilograms from the quantity calculation (base offense level 38 covers between 30–100 kilograms of heroin). *Id.* That would have been hard to do. Combined with other factors, the court put Steele in category 42, with a Sentencing Guideline range of 360 months to life. The judge exercised her discretion to sentence Steele to life in prison. Steele has not convinced the court that she should escape this sentence, or the sentencing range on which it was based.

*D. Subsequent Appeal No. 92–2627*

■■■ After oral argument, Thomas Wesson filed a subsequent appeal with this court. Apparently he had requested a copy of the trial transcript and other pertinent documents from his attorney. When his attorney did not deliver these things to Wesson's satisfaction, Wesson filed a Petition for Writ of Mandamus, asking the district court to compel his attorney to comply with his request. The district court denied that petition; so Wesson filed a subsequent appeal, asking this court to reverse the district court. But writs of mandamus are generally limited to actions directed at "any courts appointed under the authority of the United States, or to persons holding office under the authority of the United States, or a State, or an ambassador, or other public minister, or a consul, or vice-consul, as a party." 28 U.S.C. § 1651 (Revision Notes). The district court was correct to conclude that it had no authority to issue a writ of mandamus against a private attorney in a dispute with his client.

*E. Trial Transcript*

And while we are on the subject of transcripts, we should note that the appellants failed to file a trial transcript in the record on appeal. Rule 3(a) of the Rules of Appellate Procedure authorizes dismissal if the appellant fails to include the necessary components in the record on appeal. Rules 10(b)(1) and (2) require the appellant to file a copy of the trial transcript, especially where "the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence. . . ." Steele and Wesson challenge the sufficiency of the evidence; we could not have reviewed these challenges in the absence of the trial transcript. *See Fisher v. Krajewski*, 873 F.2d 1057, 1061 (7th Cir.1989) ("It is obvious that an appellate court has no alternative but to dismiss an appeal if the absence of the transcript precludes meaningful review.").

The lack of a trial transcript certainly delayed our consideration of this case. The

---

to change the law of the circuit in the way the appellants propose. Foreseeability remains the

crux of the quantity assessment, and we review a court's finding of foreseeability for clear error.

government filed a transcript after oral argument; this allowed us to consider the issues which were presented. The appellants should know that they jeopardized their appeal by failing to provide the necessary materials for our review. In the end, however, we were able to fully review the issues presented. The government should be commended. Its efforts allowed us to resolve the issues in this appeal on the merits, rather than being forced to dismiss some of them on a rules violation.

### III. Conclusion

For the foregoing reasons, we AFFIRM.