**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James FULFORD, Defendant–Appellant.**

**No. 92–1018.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 15, 1992.
Decided Dec. 2, 1992.

Colin S. Bruce, Asst. U.S. Atty. (argued), Springfield, Ill., for plaintiff-appellee.

Paul M. Brayman, Chicago, Ill., Michael B. Metnick, Richard D. Frazier (argued),

Metnick, Barewin & Wise, Springfield, Ill., for defendant-appellant.

Before CUMMINGS and MANION, Circuit Judges, and ZAGEL, District Judge.*

MANION, Circuit Judge.

James Fulford appeals his conviction for conspiracy to distribute and distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), contending that the district court erred at trial in allowing the admission of alleged hearsay testimony, as well as other allegedly irrelevant and prejudicial testimony. He also appeals the $5,000 fine imposed during sentencing as improper in light of facts of record indicating his indigence. We affirm.

## I. Facts

Sometime in the spring of 1989, Raymond Elmore ("Raymond"), at the request of his brother Richard Elmore ("Richard"), arranged to purchase one pound of methamphetamine from Fulford for $6,000. On their way from their homes in Illinois to Fulford's home in California, where the transaction was to take place, the brothers met Claire "Butch" Wiley, who expressed an interest in buying some of the drug after its acquisition. The brothers and Wiley then proceeded separately to Fulford's house, where the brothers procured the prearranged quantity of methamphetamine.

During the transaction, Fulford increased the purchase price from the agreed-upon $6,000 to $10,000. The brothers paid the $6,000 and promised to pay the remaining $4,000 at an unspecified future date. Richard then took the methamphetamine to his home in Illinois, where he diluted the drug and wrapped it in one-ounce packages. He eventually sold portions of this supply to Wiley, a woman named Bea Roof, and another woman he knew as Laurie, who was actually undercover agent Sharon Sweeney.

* Hon. James B. Zagel, District Judge for the Northern District of Illinois, is sitting by desig-

Several months after the initial purchase, Wiley and Richard began to discuss the possibility of acquiring more methamphetamine from Fulford. In May 1990, Wiley and Richard travelled to Albuquerque, New Mexico, where they had arranged with Fulford to purchase one kilogram of the drug. On arrival they attempted to contact Fulford by telephone and were told that no delivery would be made until Richard paid the $4,000 still owed from the previous deal. Richard then wired a $4,000 money order to Fulford's wife, Barbara, and awaited delivery. When after several days Fulford had not yet arrived with the drug, Richard and Wiley abandoned their venture and returned to their respective homes in Illinois and Pennsylvania.

In August 1990, Richard was arrested while selling methamphetamine to undercover agent Sharon Sweeney. After being advised of his *Miranda* rights, Richard agreed to provide information to the arresting officers. He was given no deal or other incentive to provide the information and was told only that his cooperation would be brought to the attention of the United States Attorney. Richard proceeded to disclose to one of the arresting officers, Deputy United States Marshal Bruce Harmening, the pertinent information about his involvement with the distribution of methamphetamine. Among other facts, he revealed that he had purchased $10,000 worth of methamphetamine from Fulford in the spring of 1989, that this purchase had been arranged by a third person, and that he had recently purchased approximately one-half pound of methamphetamine from Wiley.

At his arraignment, Richard pleaded guilty to the charges contained in his indictment and thereafter entered into a cooperation agreement with the government. The agreement guaranteed no special deals for Richard, it simply granted him immunity for all accurate testimony thereafter rendered. In October 1990, Wiley was arrested for an unrelated methamphetamine

nation.

transaction and entered into a plea agreement which, like Richard's cooperation agreement, granted immunity for all truthful testimony. Even though he was never indicted, Raymond also entered into a cooperation agreement which guaranteed immunity for all truthful testimony.

Fulford was indicted on February 2, 1991, and later arrested. After being advised of his *Miranda* rights, he stated to arresting officer David Pike that Wiley, Richard and Raymond had approached him to purchase drugs, and that he had agreed to supply drugs to Wiley. Fulford also admitted receiving Richard's $4,000 money order, but denied that the payment was compensation for methamphetamine.

At trial, the government presented coconspirators Raymond, Richard and Wiley, as well as a host of additional witnesses and other evidence, detailing Fulford's involvement in the methamphetamine trade. Fulford took the witness stand in an unsuccessful attempt to refute the government's evidence. The jury found Fulford guilty of both conspiracy to distribute and distribution of methamphetamine. The district judge sentenced him to twelve years in prison, followed by five years of supervised release, and assessed a $5,000 fine. Fulford appeals his conviction contending that the district court committed reversible error in allowing the admission of certain testimony. Specifically, he challenges the testimony of Deputy Harmening which was introduced to rehabilitate Richard. He also challenges as prejudicial both the admission of testimony regarding his cooperation, and the admission of testimony regarding his half-brother's possible involvement with the Hell's Angels. Finally, he appeals a $5,000 fine imposed as part of his sentence.

## II. Analysis

### A. *Richard's Testimony*

Richard's considerable involvement in both the conspiracy and the actual distribution of the methamphetamine made him a valuable government witness. The defense cross-examined Richard extensively about his reasons for cooperating with the government. In the context of general questioning about the cooperation agreement, Fulford's attorney asked "(i)sn't it true" that Richard expected his cooperation would help lessen his pending sentence. Richard answered that he was unsure how the sentencing judge would regard his cooperation. Fulford's attorney then asked "isn't it true" that Richard hoped his cooperation would also help his brother Raymond. Richard denied that he cooperated in order to help his brother. Later on re-cross examination, the defense attorney attempted to show a contradiction in Richard's testimony by comparing his post-arrest statement that he purchased the drug from Wiley with his later testimony that he purchased it from Fulford.

On re-direct examination the government was able to clarify that after Richard's arrest, he made statements about two methamphetamine transactions, one in which he purchased the drug from Fulford, and the second in which he purchased the drug from Wiley. Even with this clarification, however, the defense attorney had successfully raised the question that Richard's post-arrest statements contradicted his testimony that he had purchased methamphetamine from Fulford. The defense attorney's questioning thus raised an inference that Richard fabricated his trial testimony for the purpose of obtaining a favorable sentence and to help his brother. The government proceeded to call Deputy Harmening to the witness stand to rehabilitate the testimony of Richard.

### B. *Rehabilitation Testimony*

#### 1. Hearsay Objection

During the government's direct examination of Deputy Harmening, the following exchange took place:

Q. At the time of his [Richard Elmore's] arrest what statements did he give to you?

THE COURT: What was that? What statements?

MR. BRUCE: At the time of his arrest, what statements did Richard Elmore give to Deputy Harmening?

**1114**

A. He told us that approximately a year ago he purchased one pound—

MR. CASPER: Your Honor, I'm going to object at this time based upon the hearsay nature of the testimony.

THE COURT: No, I think that this is permissible under the rules in a criminal case, investigating officer, part of the team. No, I think this is permissible.

MR. BRUCE: Thank you, Judge.

A. He told us that approximately one year prior to that he purchased one pound of methamphetamine from Jim Fulford in California for $10,000 dollars. He said he was introduced to Mr. Fulford through a third person. He stated to me that he sold approximately half of the methamphetamine to Laurie, who is Sharon Sweeny, the undercover agent. He stated that he sold several ounces to Butch Wiley, and that he sold—I don't remember the amount—it was a smaller amount to Bea. He also said that approximately one month prior to his arrest he purchased approximately one-half pound of methamphetamine from Butch Wiley in Pennsylvania and I think it was Pocono, Pennsylvania.

(Vol. II, R. 340–341)

■ Fulford contends that the trial judge committed reversible error in overruling his hearsay objection and allowing Deputy Harmening to testify as to the prior consistent statements of Richard. We give special deference to the evidentiary rulings of the trial judge and overrule such rulings only when we find that the trial judge abused his discretion in admitting testimony. *United States v. Kramer*, 955 F.2d 479, 491 (7th Cir.1992). "Generally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court. If reasonable persons could differ, no abuse of discretion can be found." *United States v. Manos*, 848 F.2d 1427, 1429 (7th Cir.1988) (quoting *Harrington v. DeVito*, 656 F.2d 264, 269 (7th Cir.1981), *cert. denied*, 455 U.S. 993, 102 S.Ct. 1621, 71 L.Ed.2d 854 (1982)).

■ Federal Rule of Evidence 801(d)(1)(B) allows the admission of prior consistent statements to rehabilitate a witness if the following criteria are met: 1) the declarant testifies at trial and is subject to cross-examination; 2) the prior statement is consistent with the declarant's trial testimony; 3) the statement is offered to rebut an express or implied charge of recent fabrication or improper motive; and, 4) the statement was made *before* the declarant had a motive to fabricate. *United States v. Lewis*, 954 F.2d 1386, 1391 (7th Cir.1992).

■ Fulford asserts on appeal that Deputy Harmening's rehabilitative testimony failed the fourth prong of the *Lewis* test, because Richard possessed a reason to fabricate when he made the post-arrest statements. According to Fulford's theory, Richard fabricated the post-arrest statements in hopes that he would receive a lighter sentence if he cooperated. However, we cannot say that the district judge abused his discretion in allowing Deputy Harmening's testimony, because reasonable minds can differ as to when Richard may have first possessed a motive to fabricate. Certainly, one might conclude that Richard first possessed a motive to fabricate when he entered into a cooperation agreement with the government, well after his statements to Deputy Harmening. That seemed to be the theory of the defense in its cross-examination of Richard, when in the context of questions about the cooperation agreement, Fulford's attorney asked Richard "isn't it true" that he hoped his cooperation would help him at the time of sentencing and would help his brother. It was the defense that implied that the cooperation agreement presented some motive to fabricate, and the government rebutted that implication by evidence of consistent statements made by Fulford prior to the cooperation agreement.

2. Other Challenged Testimony

In his cross-examination of Deputy Harmening, Fulford's attorney continued his attacks on the consistency of Richard's testimony. He questioned Richard's initial failure to disclose the extent of his brother's involvement and asked a series of questions which suggested that Richard

also failed to reveal his sister's interest in the drug trade.

On re-direct examination, the government elicited the following testimony from Deputy Harmening:

Q. Deputy Harmening, how long, if you can approximate, how long after Richard Elmore was arrested, did he tell you that he obtained the drugs, a pound of methamphetamine from Jim Fulford?

A. Approximately 15 minutes after we arrested him.

(Vol. II, R. 351)

■ Even though Fulford made no contemporaneous objection at trial, he now challenges the admission of this testimony as impermissible hearsay. Because he did not object to its admission at trial, we review this testimony under the "plain error" standard. Fed.R.Evid. 103(d); *United States v. Nolan,* 910 F.2d 1553, 1562 (7th Cir.1990). "A 'plain error' is one that results in 'an actual miscarriage of justice,' which implies that the defendant 'probably would not have been convicted but for the erroneously admitted evidence.'" *United States v. Mejia,* 909 F.2d 242, 247 (7th Cir.1990) (citations omitted).

■ Deputy Harmening's testimony that Richard identified Fulford as a source of methamphetamine within fifteen minutes of being arrested does not rise to the level of plain error. Even prior to this testimony, Deputy Harmening had testified that Richard identified Fulford as a source of methamphetamine in post-arrest statements, and Richard had testified that these statements were made soon after his arrest. The fact that Deputy Harmening was allowed to clarify that "soon after arrest" meant approximately fifteen minutes after arrest does not amount to an actual miscarriage of justice upon which the conviction rested. The jury had already heard the substance of this information.[1]

### 3. Qualification Objection

■ Later in the re-direct examination of Deputy Harmening, the government asked him to consider all of Richard's statements, whether spoken or recorded in transcripts, and to provide a conclusion as to whether those statements ever had been inconsistent. Fulford's attorney objected, citing Deputy Harmening's lack of expertise in reviewing documents and questioning the deputy's ability to provide such a conclusion. The district court overruled the objection, and Deputy Harmening proceeded to state his conclusion that Richard's statements had been consistent. We review the trial court's evidentiary ruling concerning Fulford's objection under an abuse of discretion standard. The Federal Rules of Evidence allow a witness to testify as to an inference he has drawn from a body of evidence, when the inference is rationally based on the perception of the witness and helpful to a clear understanding of his testimony or the determination of a fact in issue. Fed.R.Evid. 701. Here, the government laid a proper foundation. Deputy Harmening was shown to be familiar with past statements of Richard, and Fulford had made the consistency of those past statements a fact in issue. See *United States v. Giovannetti,* 919 F.2d 1223, 1226 (7th Cir.1990). We conclude that the trial court did not abuse its discretion in overruling Fulford's objection as to the qualifications of Deputy Harmening.

In so deciding, we make no statement as to whether it is proper for one witness to vouch for the credibility of another witness during trial. Conceivably, such testimony might be limited or even precluded under several of the evidentiary rules which bind the district court, rules never invoked by Fulford in making his objection.[2] Indeed, one might imagine several objections that could have been made to this disputed line of questioning. However, Fulford never objected to the propriety of the testimony,

---

1. Because we decide that the admission of this testimony is not plain error, we need not address whether the testimony is impermissible hearsay.

2. To preserve an objection for appeal, the specific ground for the objection must be identified at trial. *United States v. Chaidez,* 919 F.2d 1193, 1202 (7th Cir.1990).

he objected only to the qualifications of the witness to provide it.[3]

Because Fulford never objected to the possible hearsay nature of this testimony—which seems to be the thrust of his argument on appeal—nor to its relevance, nor to its possible cumulative or prejudicial effect, nor upon any other basis possibly allowed by the rules of evidence, we review its admission in respect to these evidentiary rules under the "plain error" standard. We conclude that Deputy Harmening's rather innocuous summary of the prior consistent statements of Richard, when viewed in light of a record which indicates overwhelmingly the guilt of Fulford, was not the deciding factor in swaying the balance against the defendant. To the extent that the testimony might have been objectionable, there was no plain error.

### C. Cooperation Testimony

 Fulford took the witness stand on his own behalf and attempted to shift the blame for the distribution of methamphetamine to his half-brother, Lamont "Monty" Biggs. In response to his attorney's question concerning his cooperation with law enforcement officials, Fulford testified that after his arrest, he sought to cooperate with the police by disclosing the results of a private investigation he had conducted which implicated Monty Biggs in the manufacture of methamphetamine. By this "cooperation" testimony, Fulford sought to create the unlikely impression that he was not involved in the methamphetamine trade except as a silent crusader against its manufacture, willing to implicate even his half-brother if it meant keeping the drug off the streets.

The government recalled Officer Pike and Deputy Harmening to rebut Fulford's claim of cooperation, and they testified essentially that the defendant had never attempted to cooperate. Fulford did not object to this testimony. In fact, the defense continued to inquire into Officer Pike's and

Deputy Harmening's knowledge of Fulford's cooperation during cross examination of each of them. The trial judge, justifiably concerned that the testimony regarding cooperation should be placed into its proper context, allowed the following jury instruction, over Fulford's objection: "Testimony relating to possible offers to enter into an agreement for the defendant's cooperation with the government are immaterial to the issues you must decide concerning the charges in the indictment."

Fulford now contends that the trial judge committed reversible error by admitting evidence relating to Fulford's lack of cooperation because such evidence was irrelevant and prejudicial. Apparently Fulford did not consider this cooperation evidence irrelevant and prejudicial when he introduced it in his own trial testimony. We conclude that the trial judge did not commit reversible error by failing to rescue Fulford from his questionable strategy of introducing such tangential evidence. It is well-settled that where error is invited, not even plain error permits reversal. *United States v. Muskovsky*, 863 F.2d 1319, 1329 (7th Cir. 1988). Here, the district judge did not commit any error in allowing the cooperation testimony. Once Fulford introduced the cooperation evidence, the district judge acted properly in allowing the rebuttal testimony of Officer Pike and Deputy Harmening. The court also acted properly in providing a jury instruction, over Fulford's objection, which characterized the cooperation testimony as immaterial.

### D. Hell's Angels Testimony

 Apparently to substantiate the cooperation claim, on recross examination of Deputy Harmening, Fulford's attorney inquired extensively into the government's knowledge of possible criminal activity by Monty Biggs. In response, Deputy Harmening described the degree of the government's suspicions about the criminal activi-

---

**3.** As such, this case is similar to *Greinke v. Yellow Cab Co.*, 250 F.2d 865 (7th Cir.1958), where this court held that when a defendant objects to the nature of an expert's testimony but fails to object to the expert's qualifications, he waives any objections as to the witness' qualifications on appeal. Here, Fulford objected to the qualifications of Deputy Harmening to provide the testimony, but waived any objection to the substance of the testimony.

ty of Monty Biggs, including Biggs' possible involvement with the Hell's Angels.

Although the defense elicited this testimony regarding the Hell's Angels and never objected to it when it was thereafter repeated on redirect examination, it now argues that the trial judge committed reversible error by admitting it. As with the challenged testimony regarding Fulford's cooperation, we conclude that the trial judge did not commit reversible error by failing to rescue Fulford from the consequences of his doomed strategy of trying to inculpate his half-brother. A connection with the Hell's Angels did not prejudice the defense; it actually supported Fulford's chosen strategy of linking his half-brother to criminal activity. Regardless, Fulford's attorney first elicited the testimony regarding Monty Biggs' possible involvement with the Hell's Angels and never objected when the prosecution raised it on redirect. The admission of this evidence certainly did not so taint the trial as to constitute reversible error.

### E. Harmless Error

The trial judge did not commit error in allowing the admission of the testimony which Fulford challenges on appeal. Realistically, however, had there been error, the rest of the government's evidence was overwhelming against Fulford. The prosecution relied upon the testimony of three co-conspirators, as well as other direct and circumstantial evidence corroborating that testimony, all indicating Fulford's involvement in the conspiracy and the distribution of methamphetamine. Even if we had concluded that the trial judge erred in allowing the challenged testimony, we would have found such error harmless because none of the testimony was essential to conviction. See *United States v. Manganellis,* 864 F.2d 528, 539 (7th Cir.1988) (an evidentiary error is harmless if the untainted evidence against the defendant is overwhelming or

if the error did not have substantial influence on the jury).

### III. Sentence

Fulford also challenges the $5,000 fine imposed by the district court at the time of sentencing as contrary to indications in the record and the presentence report that he was indigent. Section 5E1.2 of the United States Sentencing Guidelines requires a district judge to impose a fine. Subsection 5E1.2(c) provides a table setting forth the minimum and maximum fines to be measured according to the criminal's offense level. The presentence report prepared by the United States Probation Office discloses Fulford's total offense level at 34, and the fine range between a minimum of $17,500 and a maximum of $4,000,-000. Subsection 5E1.2(f) gives the district judge limited discretion to impose a fine less than the Guideline range, or to waive the fine, if the defendant establishes "that (1) he is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine ... or (2) imposition of a fine would unduly burden the defendant's dependents...." Even if the district judge makes such a finding, subsection 5E1.2(f) encourages him to consider alternative sanctions, and requires him to impose some sanction which is punitive.

In assessing the fine, the district court necessarily exercised two separate judicial functions. First, the district court made a factual determination, based on the record, of the defendant's degree of indigence and the hardship which any fine would cause his family. Second, the district court exercised its discretion under 5E1.2(f) in deciding to depart below the statutory minimum fine.[4] 18 U.S.C. § 3742(e) requires this panel to accept the sentencing court's findings of fact unless they are clearly erroneous. See *United States v. Guerrero,* 894 F.2d 261, 265 (7th Cir.1990). The record supports the district judge's assessment of

---

**4.** Fulford waives the argument that the sentencing judge failed to consider the relevant factors set forth in 18 U.S.C. § 3572(a) before assessing the fine. Nevertheless we note that because the details relating to those factors are in the rec-

ord, notably in the presentence report, it is clear that the district judge considered the factors. See *United States v. Bradach,* 949 F.2d 1461, 1464 (7th Cir.1991).

Fulford's degree of indigence, and the possible hardship which his family would suffer because of the sentence. Fulford owned a car worth $1,000, a truck worth $14,000, furniture worth $5,000, and his wife was able to hire an attorney to handle this appeal. We cannot say that the district judge clearly erred in his assessment of Fulford's degree of indigence and his family's degree of hardship. Nor did the district court abuse its discretion by failing to dispense with the fine altogether. Given the district court's specific determination of Fulford's degree of indigence, we will not second-guess the court's decision that the fine imposed was appropriate to satisfy section 5E1.2's punitive purpose.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.