73 F.3d 364
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Michael HODGES, Defendant-Appellant.
 No. 93-3650.
 United States Court of Appeals, Seventh Circuit.
 Argued June 1, 1995.
Decided Dec. 15, 1995.
 
 Before COFFEY, FLAUM, and MANION, Circuit Judges.
 
 ORDER
 
 1
 Michael Hodges was convicted by a jury of one count of conspiring to distribute cocaine base (commonly known as "crack") between November 25, 1992 and December 8, 1992 and one count of distributing four ounces of cocaine base. See 21 U.S.C. Secs. 841(a)(1), 846. He was sentenced to 121 months' imprisonment to be followed by a five-year period of supervised release. On appeal, Hodges challenges the sufficiency of the evidence, an evidentiary ruling of the district court, and the constitutionality of the mandatory minimum sentence for cocaine base. We affirm.
 
 I. Background
 
 2
 In November 1992, a confidential informant advised the Drug Enforcement Administration (DEA) in Chicago, Illinois that an individual named Sherrice Anderson was distributing multiple ounces of crack cocaine. DEA Agent Patrick Humes, working with the informant, arranged to purchase one ounce of crack cocaine from Anderson on November 25, 1992.
 
 
 3
 Several days before the deal was to be consummated, Anderson contacted her cousin, Dedrick May, to obtain the drugs. May, who had brokered drug deals for Anderson in the past, planned to find a source at a liquor store in Chicago where he knew drug dealers "hung out." On his way to the liquor store, May spotted the defendant, Michael Hodges, driving past in his white Buick and May flagged him down.
 
 
 4
 May told Hodges that his cousin (Anderson) wanted to buy an ounce of crack cocaine; Hodges replied "no problem" and gave May his pager number.
 
 
 5
 On November 25, Anderson told May that she needed the crack that day. May found Hodges at the liquor store and the two men agreed to the deal and drove in Hodges's car to a house on 113th Street in Chicago. Leaving May in the car, Hodges entered the building and returned ten minutes later with an ounce bag of powder cocaine.
 
 
 6
 May then called Anderson who told him that she wanted the drugs "cooked," which required converting the powder cocaine into the rock, or crack form. Hodges re-entered the building where he had purchased the cocaine and emerged twenty minutes later with an ounce of "cooked" crack cocaine. Hodges agreed to "front" the cocaine to May, that is, give May the drugs on the condition that May pay for it later.
 
 
 7
 Hodges dropped May off at his home. Driving his mother's car to Anderson's house, May showed Anderson the crack and then drove with her to a Denny's restaurant for the rendezvous with the informant and DEA Agent. May waited in his car while Anderson completed the drug transaction.
 
 
 8
 Posing as a drug purchaser, DEA Agent Humes paid Anderson $1400 for the ounce of crack and recorded their conversation with a hidden microphone. Returning to May's car, Anderson paid May $1200. After leaving Anderson at her home, May drove to 113th Street, met with Hodges, and paid him $1100 for the crack, keeping $100 for himself.
 
 
 9
 On December 4, 1992, Agent Humes contacted Anderson and told her that he wished to purchase three or four more ounces of crack cocaine. Anderson called May who again enlisted the services of the defendant Michael Hodges. On December 7, Hodges called May to make sure Anderson was serious about the deal; May replied that she was. The next day, December 8, Anderson called May and told him the deal would take place that afternoon in the parking lot of a White Castle restaurant at 111th Street at 1 p.m. May paged Hodges, told him the details, and agreed on a price of $4000.
 
 
 10
 That afternoon, Anderson picked up May, drove to the White Castle at 111th Street, parked near the dumpsters next to the restaurant, and waited for Hodges. Inside a car on the other side of the parking lot sat DEA Agent Humes and the informant.
 
 
 11
 Hodges arrived, late, and told May and Anderson that he wanted the money up front. Anderson walked across the parking lot to the DEA vehicle and asked Agent Humes for the money; he refused to give her the cash without receiving the drugs and she returned to Hodges and May empty-handed. Hodges gave her an ounce and said the rest was still being "cooked up" and that he would return with it.
 
 
 12
 Anderson walked back to Agent Humes's car, gave him the ounce of crack cocaine and conveyed Hodges's message. While Anderson waited in Agent Humes's car, Hodges and May drove to the house on 113th Street where Hodges had previously taken May. Hodges entered the house, emerged twenty minutes later, and showed May a small box that Hodges said contained the crack.
 
 
 13
 Hodges and May drove back to the White Castle restaurant's parking lot and turned the box over to Anderson who delivered it to Agent Humes. After Agent Humes checked the box to see if it contained three ounces of crack cocaine, he proceeded to place it in the trunk of his car. At this time, DEA surveillance agents arrested Anderson. As May entered the White Castle restaurant, he saw Anderson's arrest, fled from the parking lot, but was seized and arrested by DEA surveillance agents. Hodges was at the gas station next door to the restaurant, observed Anderson's arrest, and attempted to flee. He was promptly arrested.
 
 
 14
 In January 1993, Anderson, May, and Hodges were charged with one count of conspiring to distribute cocaine base from November 24, 1992, to December 8, 1992 and one count of distributing four ounces of cocaine base on December 8, 1992.[1] Anderson and May entered pleas of guilty, while Hodges pleaded not guilty. At trial, May testified against Hodges. The jury returned a verdict of guilty against Hodges on both counts. The district court ordered Hodges to pay a special assessment fee of $100 and sentenced him to a total of 121 months' imprisonment, these sentences to run concurrently, to be followed by five years of supervised release.
 
 II. Analysis
 A. Sufficiency of the Evidence
 
 15
 Michael Hodges challenges the sufficiency of the evidence convicting him of conspiracy to distribute crack cocaine and conspiracy to distribute crack cocaine. However, a defendant who challenges his conviction on the basis of insufficient evidence faces an "early insurmountable hurdle." United States v. Teague, 956 F.2d 1427, 1433 (7th Cir.1992). The standard of review for such claims is as follows:
 
 
 16
 When reviewing a conviction for sufficiency of the evidence, we must consider the evidence and the accompanying inferences in the light most favorable to the government. Jackson v. Virginia, 443 U.S. 307, 319 (1979). We will reverse "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." United States v. Garcia, 35 F.3d 1125, 1128 (7th Cir.1994) (quoting United States v. Gutierrez, 978 F.2d 1463, 1468-69 (7th Cir.1992)); see also Jackson, 443 U.S. at 318-19. On appeal, we will not reweigh the evidence or re-evaluate the credibility of witnesses. United States v. Dortch, 5 F.3d 1056, 1065 (7th Cir.1993), cert. denied, 114 S.Ct. 1077 (1994).
 
 
 17
 United States v. Berchiolly, 67 F.3d 634, 637 (7th Cir.1995).
 
 
 18
 Hodges argues that the testimony of Hodges's co-conspirator, Dedrick May, is inherently unbelievable and must be discredited. Without May's testimony, Hodges continues, the conviction cannot stand because there was no physical evidence linking Hodges to the crime, such as fingerprints on the box containing the cocaine or "marked" money from the November 25 transaction that might have been found in Hodges's possession.
 
 
 19
 "[T]he assessment of a witness's credibility is a matter inherently within the province of the jury, and absent extraordinary circumstances, this court will not reevaluate the testimony of a witness to determine his or her motives or other possible measures of reliability." United States v. Hatchett, 31 F.3d 1411, 1416-17 (7th Cir.1994) (internal quotation omitted).
 
 
 20
 When a conviction rests solely upon the uncorroborated testimony of an accomplice, we will uphold the verdict unless the accomplice's testimony is incredible as a matter of law. To be incredible as a matter of law, the witnesses testimony must be unbelievable on its face. In other words, it must have been either physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have occurred at all.
 
 
 21
 United States v. Van Whye, 965 F.2d 528, 531 (7th Cir.1992) (internal citations omitted). The testimony of Dedrick May was not incredible as a matter of law.
 
 
 22
 First, it was physically possible for May, who had grown up with Hodges, to see Hodges's car and flag him down; it was also possible for Hodges to have driven to a drug source and purchased crack cocaine. Second, May testified that he called Hodges on December 7, the day before the White Castle transaction, and on the morning of December 8, the day of the deal. Records of the telephone company corroborated that these phone calls were made. Further, although Hodges asserts that he was at the White Castle on December 8 merely to give his friend Dedrick May a lift in his car, the issue on appeal is "not whether the defendant's interpretation of the facts is reasonable, but 'whether, after reviewing the evidence, in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " Garcia, 35 F.3d at 1131 (quoting Jackson v. Virginia, 443 U.S. 307 (1979)). The testimony of Dedrick May was not unbelievable as a matter of law; we are of the opinion that there was therefore sufficient evidence to convict Hodges of conspiracy to distribute cocaine base and distribution of cocaine base.
 
 
 23
 B. Prior Consistent Statement; Fed.R.Evid. 801(d)(1)(B)
 
 
 24
 Within 45 minutes of arrest, May gave a statement to FBI Agent Robert Fergus, describing the conspiracy to distribute the crack, including Hodges's role as the supplier. At trial, May testified to the same events that he described to Agent Fergus. During cross-examination, defendant's counsel brought out the fact that May had pled guilty and agreed to testify in the government's case against Hodges in return for sentencing lenity, implying that May's motive to cooperate with the government affected his credibility. In order to rebut the inference that May was implicating Hodges in order to get a better sentence, the government presented Agent Fergus who testified that May had told him about Hodges's role immediately upon his arrest. See Fed.R.Evid. 801(d)(1)(B). Hodges objected, but was overruled by the district court. Hodges now claims that the ruling constituted reversible error.
 
 
 25
 "Trial Judges have considerable discretion in making evidentiary rulings, and we reverse these rulings only if there was a clear abuse of that discretion." United States v. Butler, No. 94-3656, slip op. at 11 (7th Cir. Nov. 27, 1995) (citing United States v. Rodriguez, 925 F.2d 1049, 1053 (7th Cir.1991)).
 
 
 26
 Hearsay statements include oral or written assertions, other than those made by the declarant while testifying at trial, that are offered in evidence to prove the truth of the matter asserted. Fed.R.Evid. 801(c). Hearsay is generally not admissible. Fed.R.Evid. 802. However, under Rule 801(d), a statement is not hearsay if:
 
 
 27
 (1) Prior statement by a witness.--The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ...
 
 
 28
 (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.
 
 
 29
 Fed.R.Evid. 801(d)(1)(B). A prior consistent statement can be offered only to rebut an implied or express charge of recent fabrication and the declarant must have made the proffered statement before the motive to fabricate arose. Tome v. United States, 115 S.Ct. 696, 701-02 (1995).
 
 
 30
 In the case before us, May, the declarant, testified at trial and was subject to cross-examination regarding his implication of Hodges in the conspiracy. Further, Hodges's counsel specifically pointed out for the jury that May had signed a plea agreement with the government, agreeing to cooperate and testify against Hodges in return for more lenient treatment. Agent Fergus's testimony that May told him of Hodges's involvement before the plea agreement rebuts the defendant's implication that May had an improper motive to testify.
 
 
 31
 Hodges argues that May had a motive to fabricate immediately upon being arrested: he had a motive to reduce his culpability by blaming others. Therefore, according to Hodges, May's statements to Fergus do not predate the improper motive and must be excluded. However, an abuse of discretion occurs only where no reasonable person could adopt the view of the trial court; "[i]f reasonable persons could differ, no abuse of discretion can be found." United States v. Fulford, 980 F.2d 1110, 1114 (7th Cir.1992) (quoting United States v. Manos, 848 F.2d 1427, 1429 (7th Cir.1988)). In Hodges's case there was no abuse of discretion. It was reasonable for the trial court to conclude that May's motive to fabricate arose when he entered into a cooperation agreement with the government, well after his statements to Agent Fergus. Defendant's cross-examination of May made clear that May's cooperation agreement provided a motive for him to fabricate testimony against Hodges. See Fulford, 980 F.2d at 1114 (holding that trial court's decision that witness's motive to fabricate arose at the time he entered a cooperation agreement and not at the time he was arrested was reasonable and therefore not an abuse of discretion).
 
 C. Constitutional Basis for Sentencing
 
 32
 Hodges conspired to distribute 125.9 grams of cocaine base. Offenses involving more than 50 grams of cocaine base trigger a mandatory minimum sentence of ten years' imprisonment. 21 U.S.C. Sec. 841(b)(1)(A). Consistent with the mandatory minimum statute, the sentencing guidelines provide an offense level of 32 for offenses involving between 50 and 150 grams of cocaine base, which together with Hodges criminal history category of I, yield a sentence range of 121 to 151 months' imprisonment. U.S.S.G. Sec. 2D1.1(6). Hodges was sentenced to 121 months' imprisonment. However, if Hodges had been sentenced for the same quantity of the powder form of cocaine, his offense level would have been 18, yielding a sentencing range of 27 to 33 months. U.S.S.G. Sec. 2D1.1(13).
 
 
 33
 Hodges asserts that his sentence is unconstitutional because there is no rational basis for sentencing cocaine base more severely than the powder form of cocaine. Although United States v. Lawrence, 951 F.2d 751 (7th Cir.1991), held that Congress had a rational basis for the sentencing disparity between cocaine base and cocaine, Hodges argues that the decision should be revisited in light of the U.S. Sentencing Commission's recommendation to revise the sentencing scheme and scientific evidence which demonstrates that cocaine base and cocaine has the same molecular structure and are therefore synonymous.
 
 
 34
 In United States v. Booker, No. 95-1747, slip op. (7th Cir. Nov. 16, 1995), we addressed the claim made by Hodges. In that case we stated:
 
 
 35
 Despite the extensive scientific evidence introduced by [the defendant] that cocaine and cocaine base are actually the same substance, the legislative history of Sec. 841(b) demonstrates that Congress intended the terms to have different meanings.... In 1986, Congress was concerned about the emergence of a new, smokable form of cocaine that was more dangerous than powder cocaine, less expensive, and highly addictive. Whether the dangers of crack justify the 100:1 sentencing ratio is a matter of debate; the Sentencing Commission's proposal to eliminate the disparity is evidence that some experts believe not. But whatever the merits of the distinction, it is clear that Congress intended the enhanced penalties to apply to crack cocaine and the lesser penalties to apply to all other forms of cocaine.
 
 
 36
 Booker, slip op. at 9, 12-13 (internal citation omitted). Following Booker, we hold that the sentencing scheme punishing cocaine base more severely than cocaine is not ambiguous and therefore Hodges's sentence survives constitutional challenge.
 
 III. Conclusion
 
 37
 The conviction and sentence of Michael Hodges are AFFIRMED.
 
 
 
 [1]
 Anderson and May were also charged with distribution of cocaine base on November 25, 1992