In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14–2515

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FREDERICK C. ADDISON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 12-CR-30332 — **Michael J. Reagan**, *Judge.*

ARGUED MAY 26, 2015 — DECIDED OCTOBER 21, 2015

Before BAUER, KANNE, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* Police witnessed and videotaped
the defendant Frederick Addison participating in crack co-
caine sales at a drug house in East St. Louis, Illinois. A jury
later found him guilty of possession and distribution of co-
caine base. The evidence against Addison was strong. Never-
theless, Addison asks us to reverse his conviction and order
a re-trial because the government's case agent testified that
he had never prosecuted the wrong person, that one of Ad-

dison's co-criminals had a firearm, and that the surrounding neighborhood contained no other drug houses. Addison argues that this testimony undermined his right to a fair trial. We find that any error associated with the testimony about the case agent's record was invited. Furthermore, we find that the gun and neighborhood testimony did not constitute plain error. Therefore, we affirm Addison's conviction.

## I. BACKGROUND

On April 3, 2012, an undercover team of Illinois State Police officers conducted video and in-person surveillance of a suspected drug house at 825 North 32nd Street in East St. Louis. The agents conducted the surveillance from a building across the street. Over the course of almost two hours, they saw and video-recorded Addison and two of his associates, Lee Grinston and Demarcus Boyd, selling drugs to several customers.

The government played portions of the video for the jury during Addison's trial. Master Sergeant Joseph Beliveau, the commander of the police surveillance team, narrated the video and testified about what he and his team saw. In addition, Beliveau provided testimony as an expert witness concerning the distribution of crack cocaine.

The video showed Grinston walking from the drug house to the side of an abandoned house next door. He grabbed a small package from behind some plywood covering a ground-level window well. A short time later, Grinston walked back to the abandoned house and concealed an object in the same location.

When the area was clear, Agent Beliveau emerged from his surveillance position across the street, sneaked up to the

side of the abandoned house, and retrieved a tan work glove from behind the plywood covering the lower window well. Inside he found a latex glove containing two small bags of crack cocaine.

The video then showed a customer, James Robinson, approaching the front door of the drug house. He met briefly with Addison at the door, and the two appeared to make an exchange. On the way back to his car, Robinson put something in his pants pocket. As Robinson drove away, police followed his car for about five minutes, allowing him to drive a sufficient distance so as not to jeopardize the ongoing surveillance. Then the police stopped his car. They found a small amount of crack cocaine in Robinson's pocket. He later testified at trial that he had bought "a 20" (that is, a $20 piece of crack cocaine) from Addison. Robinson identified himself and Addison on the videotape as the two who were conducting the drug transaction.[1]

A little later, the video showed Addison walking to the abandoned residence adjacent to the drug house. He hid an object behind some plywood covering an upper window, just above the location where Grinston had placed drugs earlier. Agents again moved surreptitiously across the street and seized the object, which turned out to be a latex glove containing 3 grams of crack cocaine.

An apparent customer then approached the drug house. The customer handed money to Addison. Addison walked

---

[1] The surveillance team also videotaped other apparent customers who arrived at the drug house and likely bought drugs, but those transactions occurred inside the house and therefore were not witnessed by the agents or caught on tape.

over to the abandoned house and reached behind the ply-
wood covering the upper window. He found nothing—the
police had already taken the drugs that Addison stashed
there. Addison searched behind the plywood, in the nearby
bushes, down the front of his pants, and in the surrounding
area. When he came up empty-handed, Addison and Boyd
refunded the customer's money.

Addison then made a phone call. A short time later, Grin-
ston arrived at the drug house, apparently to help locate the
missing drugs. Grinston searched behind the plywood along
the side of the abandoned house. The video shows Addison
wiping his hand across his throat—a gesture that Agent Be-
liveau identified as a signal to potential customers that there
was no more crack cocaine available for purchase. Beliveau
also noticed that Grinston had what appeared to be a hand-
gun in his waistband. Afraid that someone was going to get
hurt, Beliveau gave the order to end the surveillance. Agents
immediately placed Addison and Grinston under arrest.

In addition to narrating the videotaped drug transac-
tions, Agent Beliveau testified that on March 28, 2012, five
days before the surveillance operation, police conducted a
consensual search of the drug house, during which they
seized $1,439 in cash from a kitchen drawer, among other
items. Two days later, Addison telephoned Agent Beliveau
and asked him to return the money. Addison claimed he had
earned the cash from his recording business.

At the close of trial, the court instructed the jurors that
they must presume Addison innocent and that the govern-
ment had to prove his guilt beyond a reasonable doubt. The
court also told the jurors to make their decision based only
on the evidence presented at trial, to decide for themselves

how much credence and weight each witness's testimony was to be given, and to judge Agent Beliveau's testimony in the same way they judged the testimony of other witnesses.

The jury found Addison guilty of one count of possession with intent to distribute cocaine base and one count of distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(c). The district court sentenced Addison to 210 months of incarceration and 3 years of supervised release, plus monetary penalties. Addison timely appealed.

## II. ANALYSIS

Addison contends that portions of Agent Beliveau's trial testimony were wholly irrelevant and were introduced only to arouse the jurors' emotions, thereby encouraging them to render a guilty verdict. Beliveau's challenged testimony was so improper, according to Addison, that it undermined his due process right to a fair trial.

### A. Testimony Regarding Beliveau's Track Record

Addison first takes issue with a statement made by Agent Beliveau during defense counsel's cross-examination. Specifically, Beliveau testified that he has "never … prosecuted the wrong person." The relevant portion of the transcript reads as follows, with the challenged statement in italics:

> Q.   One of the things, of course, that you are trained in is the importance of being accurate in the information that you take down and later relay. Is that a fair statement?

> A.   Accuracy? You want to be accurate, yes.

> Q.   Because if you are not accurate, it could lead to the prosecution of the wrong person?

> A.     I guess if you are very inaccurate it could lead to the prosecution of the wrong person.
>
> Q.     That would be a yes then, wouldn't it?
>
> A.     Not necessarily.
>
> Q.     It couldn't happen?
>
> A.     It has never happened before. *I have never been inaccurate and prosecuted the wrong person.*
>
> Q.     Okay. You have never been inaccurate?
>
> A.     To the point where it has prosecuted the wrong person, no, I have not. Have I made mistakes? Absolutely.
>
> Q.     Because, of course, when you decide to prosecute somebody, in your opinion you have the right person?
>
> A.     In all honesty, we present the case to the State's Attorney and they decide if we have the evidence to prosecute a person….
>
> Q.     But you first make the determination that you believe you have the right person?
>
> A.     Sure.

Even assuming the trial court erred by allowing Beliveau to testify about his track record, the error was invited by defense counsel. "It is well-settled that where error is invited, not even plain error permits reversal." *United States v. Fulford*, 980 F.2d 1110, 1116 (7th Cir. 1992). Here, it was Addison's counsel, not Beliveau, who introduced the idea of prosecuting the wrong person. Initially, Beliveau answered unobjectionably, saying he guessed it was possible to make such a mistake. Defense counsel could have moved on at that point,

but instead he pushed further, apparently hoping to get a more damaging admission. He goaded the witness with an open-ended question ("It couldn't happen?"), not knowing what the answer would be. Addison now argues that the answer he received exceeded the scope of the question. He claims that defense counsel was asking only about the importance of being accurate generally, not about Beliveau's own track record. That is splitting hairs. Beliveau responded naturally and foreseeably by drawing on and referring to his own experience. He may not have given the response defense counsel was looking for, but that is one of the dangers of cross-examination.

Moreover, defense counsel's line of questioning was purposeful; it was part of a strategy to challenge the evidence against Addison. During cross-examination, for example, counsel challenged Beliveau about how many of the hand-to-hand transactions he and his agents observed were conducted by Addison himself. Counsel also questioned whether the agents could see from across the street "what, if any kind of drug, [was] in the hand of the person involved in the transaction." Defense counsel later adverted back to Beliveau's testimony during closing argument:

> Do you recall the Government's first witness, Master Sgt. Beliveau, and recall when I would ask him a question, a question that could be answered with a simple yes or no? It got to the point where I felt like if I had said Master Sgt. Beliveau, is it still sunny outside, he would say no, it is cloudy, and that proves that your client possessed crack cocaine. Look at how somebody is holding their hand. That means they have crack cocaine. Only possible explanation. Have we ever prosecuted an innocent

person? Oh, no, we couldn't do that, couldn't happen.

In short, defense counsel opened the door to Beliveau's testimony about his track record and then relied on that testimony in closing to point out the alleged weakness of the government's case. It is not our job to rescue Addison from the consequences of that strategic choice. *See id.* (holding that trial court "did not commit reversible error by failing to rescue Fulford from his questionable strategy of introducing such tangential evidence"); *United States v. Hall*, 109 F.3d 1227, 1231 (7th Cir. 1997) (holding that defendant had "no ground for objection" to evidence of gang affiliation where "it was his counsel that brought out the gang affiliation testimony"). Any error was invited.

*B. Testimony Regarding the Gun and Neighborhood*

The second and third portions of disputed testimony came out during the government's direct examination of Agent Beliveau. In the course of explaining why he terminated the surveillance operation when he did, Beliveau explained that Grinston appeared to have a gun. Defense counsel objected on grounds of irrelevance, but the court overruled the objection. The transcript reads in pertinent part:

> Q.    Your Honor, may we play the video again? Stop, please. Okay, at this point what did you see?
>
> A.    At this point agents exited their vehicles and placed Mr. Grinston and Mr. Addison in custody.
>
> Q.    Is it fair to say by placing them into custody the surveillance ended?

A.      Yes, it did.

Q.      Who made that call?

A.      I made the call.

Q.      Why did you make that call?

A.      When Mr. Grinston returned to the resi-
        dence and exited his vehicle, I immediately
        noted that—

[DEFENSE COUNSEL:] Objection, Your Honor. Mr.
Grinston is not on trial here. What this officer may
or may not, or some other officer may or may not
have found on Mr. Grinston is not relevant in terms
of my client.

THE COURT:  Your response?

[PROSECUTION:]  What was found on Mr. Grin-
ston was the reason why this investigation came to
a halt, otherwise they would have continued with
the surveillance and it would explain why they de-
cided to end at this point.

THE COURT:  Okay, objection is overruled. He can
testify as to what he personally observed.

A.      As Mr. Grinston exited his vehicle upon re-
        turning to the residence, I immediately not-
        ed that he had what appeared to be a hand-
        gun in his waistband. While watching the
        next couple of minutes, it appeared to me
        that Mr. Grinston was extremely unhappy
        and I was fearful someone was going to get
        hurt or blamed for taking the crack cocaine
        from that residence.

Beliveau then provided the third piece of challenged tes-
timony, this time concerning the neighborhood surrounding

the drug house where Addison was arrested. The govern‐
ment's direct examination continued:

> Q.    Sergeant, were there other houses on this
>       street that were not drug houses or aban‐
>       doned buildings?
>
> A.    Yes, many.
>
> Q.    Were people living in the other houses?
>
> [DEFENSE COUNSEL:] Objection, Your Honor.
> There is no relevance to this.
>
> THE COURT:  Overruled.
>
> A.    Can you repeat the question?
>
> Q.    Sure. Were people living in the other hous‐
>       es?
>
> A.    Yes, they were.
>
> Q.    As far as you know, were the residents in
>       the other houses selling drugs or buying
>       drugs?
>
> A.    No, they were not to my knowledge.

Addison argues on appeal that the gun and neighbor‐
hood testimony not only were irrelevant but also infringed
on his right to a fair trial. According to Addison, this testi‐
mony was "used to improperly arouse the jurors' emotions"
and may well have caused them to decide the case "on an
improper basis."

Addison did not raise this constitutional objection below,
and his relevance objections were insufficient to preserve the
issue. *See United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.
1988) ("To preserve an issue for appellate review, a party
must make a proper objection at trial that alerts the court

and opposing party to the specific grounds for the objection.”). We therefore review for plain error. *United States v. Olano*, 507 U.S. 725, 732 (1993); Fed. R. Crim. P. 52(b). Under that exacting standard, Addison must show (1) that there was an error; (2) that it was plain; and (3) that it affected his substantial rights. *United States v. Irby*, 558 F.3d 651, 655 (7th Cir. 2009) (citing *Olano*, 507 U.S. at 732). Even then, we will exercise our discretion to correct the error only if staying our hand would result in a “miscarriage of justice.” *Id.*

It is a fundamental principle of our criminal law that a defendant is presumed innocent. *Taylor v. Kentucky*, 436 U.S. 478, 483 (1978). The burden is on the government to overcome that presumption by producing evidence and convincing the jury beyond a reasonable doubt. *Id.* at 483 n.12. Moreover, the defendant is “entitled to have his guilt or innocence determined solely on the basis of the evidence adduced at trial.” *Id.* at 485. Thus, we have held that the presumption of innocence is violated “when presentation of evidence at trial affects the quantum of proof required for conviction or when the jury is encouraged (or allowed) to consider facts which have not been received in evidence.” *United States v. Garcia*, 439 F.3d 363, 367 (7th Cir. 2006).

In *Taylor*, the trial court refused to instruct the jury on the presumption of innocence and the indictment’s lack of evidentiary value. 436 U.S. at 479. In addition, the prosecutor in his closing argument asked the jury to draw inferences from “facts” not in evidence. The prosecutor commented, for example, that the defendant “*like every other defendant* who’s ever been tried who’s in the penitentiary or in the reformatory today” is entitled to a presumption of innocence. *Id.* at 486. The Supreme Court reversed the conviction because it found

a "genuine danger" that the jury convicted the defendant based on extraneous considerations such as his indictment or his status as a defendant, rather than on the basis of the evidence at trial. *Id.* at 487–88.

The Supreme Court has since emphasized that its decision in *Taylor* was "expressly limited to the facts." *Kentucky v. Whorton*, 441 U.S. 786, 789 (1979). Whether a trial court's failure to give a jury instruction or to take some other action in a given case undermines the defendant's right to a fair trial depends on the "totality of the circumstances." *Id.* at 788–89. In general, errors at trial do not rise to constitutional dimensions where the evidence weighs strongly against the defendant and the trial court properly instructed the jury. *See United States v. Thomas*, 453 F.3d 838, 846 (7th Cir. 2006); *Garcia*, 439 F.3d at 368; *United States v. Cornett*, 232 F.3d 570, 575 (7th Cir. 2000).

Applying these principles, we find no plain error in Addison's case. As an initial matter, we note that the district court properly instructed the jury regarding Addison's presumption of innocence and the government's burden to prove his guilt beyond a reasonable doubt. While there is a possibility that the jury considered the gun and neighborhood testimony in its decision to convict, the fact remains that the evidence against Addison was overwhelming. Agents personally witnessed him selling drugs and caught the transactions and other incriminating behavior on video. One of his own buyers (James Robinson) testified against him. A plain error "affects substantial rights" under Rule 52(b) only if it affected the outcome of the trial proceedings. *See United States v. Baker*, 655 F.3d 677, 681 (7th Cir. 2011). The challenged testimony here did not—Addison would

have been convicted even without it. For the same reason, leaving his conviction in place will cause no miscarriage of justice. *See United States v. Patterson*, 241 F.3d 912, 913 (7th Cir. 2001) ("[W]hen the evidence of guilt is overwhelming a miscarriage of justice is very hard to demonstrate.").

### III. CONCLUSION

We therefore AFFIRM Addison's conviction.