In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2917

SHAWN PATTERSON,

*Plaintiff-Appellant,*

*v.*

MATT BAKER, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:13-cv-1121 — **Michael M. Mihm**, *Judge.*

ARGUED NOVEMBER 3, 2020 — DECIDED MARCH 15, 2021

Before KANNE, SCUDDER, and ST. EVE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Shawn Patterson, an inmate in the custody of the Illinois Department of Corrections, invoked 42 U.S.C. § 1983 and brought suit, alleging that a group of correctional officers violated the Eighth Amendment's prohibition on cruel and unusual punishment by beating him and then parading him naked in front of his fellow prisoners. At trial the nurse who treated Patterson after the alleged incident testified that there could possibly be bruising if such a beating

had occurred—though she saw no signs of bruising on Patterson. A jury found in favor of the officers. Patterson argues that the nurse's testimony constituted impermissible expert testimony by a lay witness that swayed the jury's verdict against him. The district court rejected the contention as part of denying Patterson's challenge to the jury's verdict and request for a new trial. We affirm.

**I**

A

The trial evidence supplies the operative facts on appeal. See *Barber v. City of Chicago*, 725 F.3d 702, 705 (7th Cir. 2013).

In early February 2012, Patterson was transferred to a new cell without heat at the Hill Correction Center in Galesburg, Illinois. He testified that his repeated requests for blankets or to be moved to a new cell went ignored. To get a supervisor's attention, Patterson resorted to violating the prison's rules and racking up a flurry of disciplinary tickets. Our focus is on what Patterson did, and how the correctional officers responded, on February 7.

While making their morning rounds, Officers Raul Martinez and Matt Baker noticed that Patterson had covered his cell door window with paper to prevent anyone from seeing inside. Officer Martinez ordered Patterson to remove the paper several times. But that was not the end of the matter. Patterson testified that the officers returned to his cell later that day and beat him. Patterson further alleged that Sergeant Todd Fredrickson ordered the officers to conceal the beating by punching him in parts of the body where bruising would go unnoticed. In Patterson's telling, the officers then stripped him naked, paraded him around the cell block, and ignored

his request for medical treatment. Patterson further testified that he endured a second beating two days later at the hands of different officers led by Sergeant Fredrickson and once again received no medical help until the next day, February 10, when he saw Licensed Practical Nurse Brenda Aldridge and received pain medication.

The officers provided a very different account at trial. Sergeant Fredrickson testified that he responded to Patterson's cell the morning of February 7 after learning from Officer Martinez that Patterson refused to remove the window covering. Sergeant Fredrickson explained that he found Patterson naked upon entering his cell and from there handcuffed him and moved him to another area of the prison. Sergeant Fredrickson and the other officers denied any other physical contact with Patterson. As for the alleged second beating, Sergeant Fredrickson testified that the only interaction he had with Patterson on February 9 was moving him to a new cell, which was uneventful and routine.

For our purposes, the main event at trial was Nurse Aldridge's testimony. Patterson called Nurse Aldridge as his own witness, asked her to describe her examination of him on February 10, and introduced into evidence the injury report she prepared. Nurse Aldridge testified that Patterson reported scrapes, neck and ankle pain, and swelling of his wrists. In her report, she recorded observing "no visible signs or symptoms" of injury on the left side of Patterson's back but did see small scrapes on his wrists. She diagnosed Patterson with a "soft tissue injury" and prescribed ibuprofen. Nurse Aldridge told the jury she considered Patterson's injuries "minor."

At one point during redirect examination, Patterson's counsel asked Nurse Aldridge if it is possible "to feel pain without showing visible symptoms." She answered, "Yes." Defense counsel returned to that answer on recross examination by asking Nurse Aldridge the flip side of the same question. Here is the pertinent exchange and testimony:

> DEFENSE COUNSEL: And for an injury – for instance, this one, it happened the day before, would you anticipate that there would be signs?
>
> PATTERSON'S COUNSEL: Objection, Your Honor…. It calls for expert testimony.
>
> DEFENSE COUNSEL: Your Honor, in this instance she would be considered an expert because she did evaluate him and is a medical professional.
>
> THE COURT: I'll allow it. You may answer.
>
> NURSE ALDRIDGE: With what the inmate complained of, there would have been possibly—not always but possibly bruising, some redness.

The jury returned a unanimous verdict in favor of the three correctional officers.

## B

Patterson then moved under Federal Rule of Civil Procedure 50(b) for judgment as a matter of law or, alternatively, a new trial pursuant to Rule 59. He argued that the district court never should have allowed Nurse Aldridge, who testified as a fact witness, to offer an expert opinion on recross about whether, based on Patterson's account of the beatings he experienced, she would have anticipated seeing signs of injury during her examination of him on February 10. The district

court's allowing this testimony, Patterson contended, destroyed his credibility and accounted for the jury's adverse verdict.

The district court denied Patterson's motions. Without resolving whether Nurse Aldridge offered expert testimony, the district court concluded that any error in allowing her to opine that she "possibly" would have expected to see "bruising, [and/or] some redness" based on the injuries Patterson reported experiencing was harmless. That portion of Nurse Aldridge's testimony, the district court concluded, could not have affected the outcome of the trial because the jury—in testimony that Patterson does not challenge—heard Nurse Aldridge explain that she observed no visible bruising while examining Patterson.

Patterson now appeals.

## II

### A

The Federal Rules of Evidence define the basic dividing line between expert and lay testimony. See *United States v. Christian*, 673 F.3d 702, 708–14 (7th Cir. 2012) (referencing Rules 702 and 703 and explaining the differences). Expert witnesses draw on scientific, technical, or other specialized knowledge to help the finder of fact understand evidence or to determine a fact at issue. See FED. R. EVID. 702. Lay or fact witnesses, by contrast, most often draw on personal knowledge and testify in terms of what they saw, heard, or did in particular circumstances. See FED. R. EVID. 602; see also *United States v. Proano*, 912 F.3d 431, 441 (7th Cir. 2019) ("Rule 602 allows a witness to testify 'to a matter only if … the

witness has personal knowledge of the matter.'"(alteration in original) (quoting FED. R. EVID. 602)).

While expert witnesses are typically called to share specialized opinions, lay witnesses must limit their opinions to matters not only rationally based on their personal perceptions, but also that will be helpful to understanding the witnesses' broader testimony or determining a fact at issue. Compare FED. R. EVID. 701 with 702, 703; see also *United States v. Fenzl*, 670 F.3d 778, 782 (7th Cir. 2012) (explaining that lay witnesses must tether any inferences to their own perception and the "reasoning process … of an average person in everyday life" not to any specialized training or experience).

Distinguishing between lay and expert testimony can be challenging. Indeed, in some instances, a witness may serve both functions. So-called "dual-role testimony" is permissible, though district courts must guard against the "inherent danger[]" that the jury may conflate a witness's lay testimony with the portion of that witness's testimony that is expert. See *United States v. Jett*, 908 F.3d 252, 267 (7th Cir. 2018).

These distinctions matter because expert witnesses often carry an "aura of special reliability." *United States v. York*, 572 F.3d 415, 425 (7th Cir 2009) (quoting *United States v. Brown*, 7 F.3d 648, 655 (7th Cir. 1993)). To account for that reality, parties offering expert testimony at trial must meet the strict standards of admissibility in Rule 702. Judges play an important gatekeeping role in this process, evaluating whether the proffered testimony "rests on a reliable foundation and is relevant." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Federal Rule of Civil Procedure 26 also imposes particular disclosure requirements for expert witnesses. Parties must disclose all experts before trial, and

for any expert retained to testify, must provide a report conveying the expert's qualifications, the opinions to be offered at trial, and the data or facts those opinions rely upon, among other requirements. See FED. R. CIV. P. 26(a)(1)–(2).

B

Patterson asks us to order a new trial on the basis that the district court allowed Nurse Aldridge to testify as an expert witness when she took the stand only as a fact witness.

As a beginning point, we cannot say that Nurse Aldridge's one-sentence reply to a question on recross about whether she would expect to see bruising constituted an expert opinion. All Nurse Aldridge stated was that "with what the inmate complained of, there would have been possibly – not always but possibly bruising, some redness." Though defense counsel, after Patterson objected, was quick to agree that Nurse Aldridge's answer would amount to expert opinion, that perspective is not dispositive and in no way dictates our own view. Any person—and especially the nurse who had treated Patterson—could observe that an alleged beating by multiple correctional officers could possibly result in bruising. We are quite hesitant in these circumstances to call Nurse Aldridge's limited and commonsense response an expert opinion. Doing so would run the risk of converting many ordinary, percipient observations of a nurse or other health care professional into expert opinions requiring compliance with the disclosure requirements of Federal Rule of Civil Procedure 26 and admissibility standards of Federal Rule of Evidence 702.

Regardless, we have no difficulty concluding that any error in admitting Nurse Aldridge's statement was harmless and did not affect Patterson's substantial rights. See FED. R.

Cɪᴠ. P. 61. To receive a new trial, Patterson must show that
Nurse Aldridge's brief remark that there could *possibly* be
bruising had a "substantial influence over the jury, and the
result reached was inconsistent with substantial justice." *Far-
faras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 564 (7th Cir.
2006) (quoting *United States v. Hernandez*, 330 F.3d 964, 969
(7th Cir. 2003)).

Patterson has not met that demanding standard. Remem-
ber how the challenged testimony came about. It was Patter-
son—not any defendant—who opened the door on redirect to
the opinion Nurse Aldridge offered on recross. Patterson
asked Nurse Aldridge if, in her view, it was "possible to feel
pain without showing visible symptoms." Defense counsel
heard the question and response and, perhaps as expected,
used recross to ask Nurse Aldridge whether she "would …
anticipate that there would be signs" for the type of injuries
Patterson reported. That limited question is no more than the
opposite side of Patterson's inquiry put to Nurse Aldridge
minutes earlier. Plain and simple, Patterson walked himself
into Nurse Aldridge's testimony and now must accept the
consequences. See *United States v. Addison*, 803 F.3d 916, 919
(7th Cir. 2015) ("[W]hen error is invited, not even plain error
permits reversal." (quoting *United States v. Fulford*, 980 F.2d
1110, 1116 (7th Cir. 1992))).

Even so, we are confident Patterson was not prejudiced by
Nurse Aldridge's testimony. On this score, recall that the jury
had already heard Nurse Aldridge describe that she observed
no signs of physical injury (beyond minor scrapes) upon ex-
amining Patterson on February 10. So, too, did the jury hear
Nurse Aldridge state that sometimes injuries occur but do not
result in physical bruising. All of this leads us to conclude that

any error in allowing Nurse Aldridge to testify that physical bruising could possibly occur with the type of injuries Patterson claimed he suffered one day prior to treating him was harmless.

At the end of the day, this case boiled down to a "he-said, they-said" situation—a credibility contest. The jury appears to have credited the testimony of three officers, combined with Nurse Aldridge's report and testimony showing that Patterson presented with minimal injury, rather than Patterson's allegations of brutal beatings covered up by a cadre of officers with the tacit participation of Nurse Aldridge.

We AFFIRM the denial of Patterson's request for judgement as a matter of law or a new trial.